

**ORDERED in the Southern District of Florida on March 1, 2019.**

*Raymond B. Ray, Judge*
*United States Bankruptcy Court*

___

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No.: 17-20926-RBR |
| FRANCISCO M. JIMENEZ, | Chapter 7 |
|    Debtor. _____/ | |
| SUSAN JOHNSON and STEVEN JOHNSON, | Adv. Case No.: 18–1101-RBR |
|    Plaintiffs, | |
| v. | |
| FRANCISCO M. JIMENEZ, | |
|    Defendant. _____/ | |

1

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT OF
PLAINTIFFS SUSAN JOHNSON AND STEVEN JOHNSON
ON COUNTS I, II, AND III OF THEIR
<u>AMENDED COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBT</u>**

This matter came before the Court for a hearing on January 9, 2019 [D.E. 43] upon the Motion for Summary Judgment [D.E. 37] (the "Motion") of the Plaintiffs Steven Johnson ("Steven") and Susan Johnson ("Susan") (collectively, the "Johnsons"), in connection with which the Johnsons filed the Affidavit of the Debtor Francisco Jimenez (the "Debtor") (the "Affidavit of the Debtor") [D.E. 33], the Rule 7030 Deposition Transcript of Ericka Lovato ("Lovato 7030") with exhibits [D.E. 34], the Rule 7030 Deposition Transcript of the Debtor ("Debtor 7030") with exhibits [D.E. 35], the Rule 2004 Deposition Transcript of the Debtor ("Debtor 2004") with exhibits [D.E. 36], a February 14, 2018 hearing transcript from the main case [D.E. 38], the Affidavit of Steven Johnson ("Steven Afft.") [D.E. 39], and the Affidavit of Susan Johnson ("Susan Afft.") [D.E 40], as well as the Debtor's Response in Opposition to the Motion [D.E. 43].

The Johnsons' Amended Complaint seeks a non-dischargeability judgment against the Debtor based on the same facts, on three separate grounds. Count I is brought pursuant to 11 U.S.C. § 523(a)(2)(A), Count II is brought pursuant to 11 U.S.C. § 523(a)(4), and Count III is brought pursuant to 11 U.S.C. § 523(a)(6). The Johnsons' Amended Complaint seeks not only a finding as to non-dischargeability against the Debtor, but asks the Court also to liquidate the sum of non-dischargeable debt as to each of the Johnsons under applicable bankruptcy caselaw.

The gist of the Johnsons' Motion is that over a period of four years, the Johnsons collectively transferred over $1 million to an entity owed one-third by the Debtor, one-third by the Debtor's girlfriend Ericka Lovato ("Lovato"), and one-third by Susan. According to the Johnsons, unbeknownst to them, the Debtor was simultaneously using the company's money for personal gain, leaving it with substantial debt and nothing for the Johnsons upon its ultimate closure. Under Count I, the Johnsons contend that this conduct falls squarely within the "fraudulent conveyance scheme" that the Supreme Court held in *Husky International Electronics, Inc. v. Ritz*, 578 U.S. ___, 136 S. Ct. 1581 (2016), gives rise to a non-dischargeable obligation under the "actual fraud" prong of § 523(a)(2)(A). The Debtor's same conduct, according to the Johnsons, also falls into the "false pretenses" and "false representations" prong of § 523(a)(2)(A) because these transfers by the Johnsons were the result of representations by the Debtor that the Johnsons contend were

materially false—that the company needed money to pay its bills when that was not the case. Last, the Johnsons contend the Debtor's same conduct also constitutes larceny and embezzlement pursuant to § 523(a)(4) under Count II, and willful and malicious injury pursuant to § 523(a)(6) under Count III.

The Court, having heard the argument of counsel, and having considered all of these materials of record, grants the Motion, as set forth below.

I. **Facts Not Subject to Dispute**

The Debtor filed this chapter 7 proceeding on August 29, 2017 (the "Petition Date"), two days before the hearing on Steven's summary judgment motion on his fraud claim against the Debtor and Lovato in Martin County, Florida Circuit Court. Steven Afft at ¶ 17. That fraud claim was based on the Debtor and Lovato allegedly draining the company at issue of assets while Steven was transferring to it substantial sums based on the representations by the Debtor that those transfers were for operating capital and other legitimate expenses. *Id*. at ¶ 17. The hearing proceeded as to the non-filing Lovato and a summary final judgment for fraud was entered against her at that hearing. *Id*. Due to the Debtor's bankruptcy filing, the matter of his fraud and the non-dischargeable amount are now issues for this Court.

A. The Johnsons Meet the Debtor.

In 2005, Susan met the Debtor who represented himself to her as someone who could assist her with developing new business ventures. Susan Afft at ¶ 3; Debtor 2004 at 84:25-85:21. The Debtor represented that he had extensive marketing experience and many good business ideas. Susan Afft at ¶ 3. During their initial meetings, the Debtor represented that he had held high-level business and marketing positions with Spaulding, Bausch and Lomb, Nike, and AT&T, with significant experience opening, marketing, and operating new businesses for them. *Id*.; Debtor 2004 Exam at 90:19-91:6.

B. The Debtor and Lovato move into Mrs. Johnson's vacant house.

Susan thereafter became friendly with the Debtor and Lovato. Susan Afft at ¶ 4. In late 2005 or early 2006, the Debtor and Lovato moved into Susan's vacant townhome in Hobe Sound, where the two, and later their baby, would live for the next 10 years, until the end of 2015. *Id*.; Debtor 2004 at 8:14-9:1; Lovato 7030 at 42:20-24. At no time did the Debtor or Lovato ever pay any rent. Susan Afft at ¶ 4; Debtor 2004 at 9:2-8.

Susan completely trusted the Debtor and Lovato in every way and treated them like family. Susan Afft at ¶ 4; Debtor 2004 at 10:15-21; 96:22-25; 97:3-4. Eventually, Steven would meet them and came to trust them as well. Steven Afft at ¶ 2. At all times material, the Johnsons lived in Connecticut. Susan Afft at ¶ 1; Steven Afft at ¶ 1. Lovato and Susan became "prayer buddies" and "spiritual sisters." Lovato 7030 at 13:23-14:23.

### C. Susan starts investing in ventures with the Debtor and Lovato.

Based on their close relationship and the Debtor's representations about his marketing and business experience, Susan began transferring substantial sums to ventures with the Debtor and Lovato, all of which were operated by the latter two in Florida. Susan Afft at ¶ 5. In each of these businesses, the Debtor and Lovato owned part of the business, and Susan was the other owner. *Id.*; Debtor 2004 at 90:5:18. Every time, Susan provided all the necessary funds for the business to open and to operate, while the Debtor and Lovato purportedly contributed "sweat equity." *Id.* No written agreements were ever prepared. Debtor 7030 at 35:17-24.[1]

Between 2005 and 2010, Susan transferred a total of $261,276.86 to these ventures from her inheritance, draws from a credit line against real property she had inherited (some initiated by the Debtor), and from family funds. Susan Afft at ¶ 7. No return was ever provided to Susan. *Id.*; Debtor 7030 at 34:10-35:17. In one instance, Susan had to pay $10,000 and attorneys' fees to a landlord for back rent when one of the companies failed. *Id.*

### D. The Johnsons transfer over $1,000,000 to Cinagro Freshworks LLC.

**1. Cinagro's business, formation, and structure**

Cinagro Freshworks, LLC ("Cinagro"), which did business as DiCappos Market, was formed as a Florida limited liability company on or about October 3, 2012 to operate a market, café, and catering business, although it had bank accounts and business plans prior to its formation. Susan Afft at ¶ 8; Debtor 2004 at 70:18-25. At all times, Cinagro's three members were the Debtor,

---

[1] The first of these ventures was Copella which was a digital magazine featuring jewelry and key ring accessories. Susan Afft at ¶ 6. The next was Modus Media Works, Inc., which developed digital signage and rolling displays. *Id.* In connection with the Modus Media business, the Debtor obtained legal authority from Mrs. Johnson to draw on her line of credit against real estate she owned in Florida. *Id.*; Debtor 7030 at 19:9-20:12. Another business was to license 10,000 BC for bottled water. Susan Afft at ¶ 6. A fourth was KOH Coconut to distribute coconut water. *Id.* Another was to market and distribute sunscreen. *Id.* Another was a sandwich shop in a Valero Gas Station in Port St. Lucie. *Id.*

4

Lovato, and Susan, each owning 1/3 of Cinagro. Susan Afft at ¶ 8; Debtor 2004 at 51:6-11. The Debtor was at all times Cinagro's managing member. Susan Afft at ¶ 8; Debtor 2004 at 51:12-18. The Debtor and Lovato operated and managed the business in every way, with the Debtor as operating and financial manager. Susan Afft at ¶ 8; Debtor 2004 at 28:20-29:1; 51:12-18; 103:23-104:4.

Susan was never present in Florida; Steven visited Florida sporadically; neither had any presence at Cinagro. Susan Afft at ¶ 9; Steven Afft at ¶ 6; Debtor 2004 at 28:20-29:1; 52:6-23. Cinagro never had any written operating or any other type of agreement. Susan Afft at ¶ 9; Debtor 2004 at 58:19-59:6; 71:7-10; Debtor 7030 at 35:25-36:12. Neither the Debtor nor Lovato contributed or transferred any cash or any other tangible property to Cinagro. Susan Afft at ¶ 9; Debtor 2004 at 58:19-59:6; 71:11-17.

**2. The Debtor maintained sole access to Cinagro's financial and business records.**

The Debtor kept and maintained all of the business, banking, and financial records of Cinagro, with complete and sole access. Susan Afft at ¶ 10; Steven Afft at ¶ 7; Debtor 2004 at 104:5-105:15. Only the Debtor and Lovato had signatory authority over Cinagro's bank accounts; the Johnsons had none. Susan Afft at ¶ 10; Steven Afft at ¶ 7. Neither of the Johnsons had any access to the Cinagro bank accounts, bank records, financial records, or business records without going through the Debtor. Susan Afft at ¶ 10; Steven Afft at ¶ 7; Debtor 7030 at 16:16-23. The Debtor admits that he never put any of Cinagro's bank accounts or records on-line for remote access; these bank accounts and financial records were either at Cinagro, at the Debtor's residence, or for a limited period in 2015, a portion were at the Cinagro CPA's Stuart office. Debtor 2004 at 100:25-102:3. When Steven came to Florida to investigate Cinagro's business in June of 2015, Steven was unable to locate or to access all of Cinagro's business or financial records. Steven Afft at ¶ 12.

**3. The Johnsons' transfers to Cinagro from 2012 through 2015**

In 2012, Susan transferred family cash to Cinagro and incurred personal credit card charges or herself paid bills for Cinagro totaling $221,397. Susan Afft at ¶ 12.

In 2013, Susan transferred family cash to Cinagro and incurred personal credit charges or herself paid bills for Cinagro totaling $97,531.00. Susan Afft ¶ 12. In 2013, Steven transferred $60,000 in cash into Cinagro. Steven Afft at ¶ 6.

5

In 2014, Steven transferred $233,000 in cash to Cinagro. Steven Afft at ¶ 8. Steven also purchased a VW Passat for Cinagro for $20,326.47 in 2014. *Id*. Susan transferred family cash to Cinagro and incurred personal credit card charges or herself paid bills for Cinagro totaling $41,598.00 in 2014. Susan Afft at ¶ 12.

In 2015, Steven transferred $445,740.67 in cash in Cinagro. Steven Afft at ¶ 10. In 2015, Susan purchased an oven for Cinagro with her own funds. Susan Afft at ¶ 12.

During the times the Johnsons makes these transfers from 2012 until the transfers stopped in 2015, the Debtor represented several times a week, mostly to Susan, but starting in 2013 and into 2015, to Steven well, that Cinagro was unable to pay its bills, and needed cash infusions to pay its landlord for rent, to make its payroll for its employees, to pay IRS withholding taxes, to pay Florida state sales tax, and to pay suppliers and vendors for food and operating supplies because Cinagro was struggling financially, lacked revenue or money to make these payments, and was not generating sufficient cash to pay its bills. Steven Afft at ¶¶ 8, 10; Susan Afft at ¶ 11; Debtor 2004 at 54:56:8; 106:5-107:14. The Johnsons transferred these monies and paid Cinagro's bills based on these representations by the Debtor. Steven Afft at ¶¶ 8, 10; Susan Afft at ¶¶ 11-12; Debtor 2004 at 54:7-56:8; 56:21-57:7; 58:9-11; 106:5-107:14. Cinagro never made any profit that was provided to the Johnsons. Debtor 2004 at 62:22-63:12; 83:6-13. The Johnsons never received back any of their funds. Steven Afft at ¶ 10; Susan Afft at ¶ 12.

### 4. The Johnsons investigate Cinagro.

In June of 2015, the Johnsons became concerned about what was happening to their money. Susan Afft at ¶ 13; Steven Afft at ¶ 11. The Johnsons attempted to put a manager and a CPA in place, but neither of them nor the Johnsons were provided with full or meaningful access to Cinagro's records. *Id*. Steven contacted legal counsel who prepared a promissory note reflecting his transfers for Cinagro to sign, with the Debtor and Lovato to sign as guarantors. Steven Afft at ¶ 12. The Debtor refused. *Id*.; Debtor 2004 at 46:20-49:23; Debtor 7030 at 27:15-23, Ex. 1. As a result of the Debtor's failure to sign the promissory note, the Johnsons stopped funding Cinagro. Susan Afft at ¶ 13; Steven Afft at ¶¶ 12-13.

### 5. The Johnsons Sue the Debtor and Lovato.

On August 18, 2015, the Johnsons' attorney asked for an accounting and related financial disclosures from Cinagro. Steven Afft at ¶ 14. On August 19, 2016, the Johnsons initiated legal proceedings in Martin County Circuit Court against the Debtor and Lovato in which the Johnsons

6

ultimately sought a judicial dissolution of Cinagro (Count I), and damages for fraud (Count II). *Id*.

### 6. The Debtor starts selling Cinagro's assets and taking the proceeds.

Around the time the Debtor and Lovato were sued and continuing after the lawsuit, without any permission from either of the Johnsons, the Debtor fired the manager the Johnsons had put in place at Cinagro, ceased communicating with the Johnsons or the CPA they tried to put in place, and began taking money from Cinagro's bank accounts and selling its assets and taking the proceeds for himself. Steven Afft at ¶ 15. The Debtor then turned Cinagro over to a supplier for nothing during the litigation. Debtor 2004 at 72:7-25; Steven Afft at ¶ 15. The Debtor caused Cinagro to sell the oven that Susan has purchased for Cinagro to a pizza parlor, Pavoli, LLC, with the Debtor taking the $2,000 sales proceeds and depositing it into his own bank account. Steven Afft at ¶ 18.

### 7. The Johnsons discover the Debtor's transfer of substantial Cinagro funds to himself.

With subpoenas in their Martin County Circuit Court proceeding, the Johnsons ascertained some of how the Debtor handled Cinagro's finances and uncovered much more during the Debtor's bankruptcy. Steven Afft at ¶ 16. Unbeknownst to either of the Johnsons, throughout Cinagro's operations between 2012 and 2015, the Debtor caused Cinagro to pay hundreds of thousands of dollars from the Johnsons' monetary transfers to the Debtor and Lovato in substantial ATM cash or cashier check withdrawals, or to third parties unrelated to Cinagro that appear to be for the Debtor's personal benefit or those of his family or friends. *Id*.

Prior to the Debtor's bankruptcy, the Johnsons specifically ascertained that the Debtor used at least $126,469.00 of funds transferred by the Johnsons to Cinagro for ATM cash withdrawals and Cinagro counterchecks to the Debtor and Lovato ($71,221.00), payments to their personal credit cards ($24,006.00), personal groceries ($7,488.00), and personal entertainment ($12,552.00). Steven Afft at ¶ 16. Based on this information, Steven filed a summary judgment motion against the Debtor and Lovato in the Martin County Circuit Court case on the fraud count for these funds. *Id*. at ¶ 17. Two days before the hearing, the Debtor filed his chapter 7 bankruptcy which stayed the proceedings as to him, but the Martin County Circuit Court entered a final fraud judgment against Lovato for these sums on August 31, 2017. *Id*.

Neither the Debtor nor Lovato have explained the above $126,469.00 in transfers, or the following transactions:

(1) Cinagro check payable to "City of Utica Tax Dep't," for $225.60 marked "Lot #319-71-1-16-Tx Pmt" signed by the Debtor. Steven Afft at ¶ 19(1). Neither the Debtor nor Lovato can explain this check. Debtor 7030 at 86:22-87:20; Lovato 7030 at 79:16-80:14, Ex. 8. Nothing in Cinagro's records provides an explanation. Steven Afft at ¶ 19(1).

(2) Cinagro check payable to "Corina Kneiger," the Debtor's adult daughter, for $3,000 marked "wedding" and signed by the Debtor. Steven Afft at ¶ 19(2). Neither the Debtor nor Lovato can explain this check. Debtor 7030 at 86:22-87:20; Lovato 7030 at 83:10-84:9, Ex. 10. Nothing in Cinagro's records provides an explanation. Steven Afft ¶ 19(2).

(3) Cinagro check for $17,000 deposited into the Debtor's bank account. Steven Afft at ¶ 19(3). Cinagro's records provide no explanation. *Id*.

(4) Cash withdrawals from Cinagro for $5,000.00 each on June 22, 2015 (two), and June 26, 2015, and $4,000 on June 30, 2015 for which there is no explanation in Cinagro's records. Steven Afft at ¶ 19(4). This was after Steven began to investigate his and Susan's funds and had asked the Debtor for access to Cinagro's records.

(5) Cash withdrawals from Cinagro signed for by the Debtor totaling $12,500, and Lovato doing the same totaling $1,500, neither of whom can explain them. Debtor 7030 at 70:24-74:10, Ex.9; Lovato 7030 at 72:5-20, Ex. 6. Nothing in Cinagro's records provides an explanation. Steven Afft at ¶ 19(5). The deposit records into Cinagro's other account do not reflect any of these sums being deposited, which was the only possible explanation provided by the Debtor. *Id*.

(6) $17,000 cashier check from Cinagro account signed for at the bank by Lovato and deposited into the Debtor's bank account. Steven Afft at ¶ 19(6). Neither the Debtor nor Lovato can explain this check. Debtor 2004 Exam at 116:22-119:23, Ex. 2; Lovato 7030 at 78:23-79:15, Ex. 7; Debtor 7030 at 86:22-87:20. Nothing in Cinagro's records provides an explanation. Steven Afft at ¶ 19(6). This check was issued a few days after the Johnsons sued the Debtor and Lovato.

(7) Cinagro check payable to "Francis Jimenez" for $4,000 marked "Monthly Salaries" that neither the Debtor nor Lovato can explain, except to claim they never drew salaries. Debtor 7030 at 65:22-70:18, Ex.8; Lovato 7030 at 65:19-66:25, Ex. 4. Nothing in Cinagro's records provides an explanation. Steven Afft at ¶ 19(7). The check was issued two months after the lawsuit and Cinagro had closed. *Id*.

(8) Cinagro check payable to "Cobblestone Realty" for $2,050 signed by the Debtor and marked "Deposit Rental Palm City" a week after he and Lovato were sued. Steven Afft at ¶ 19(8). The Debtor claims the Cinagro check was for a deposit on a personal

8

residence after he and Lovato were evicted from Susan's Peppercorn house but never negotiated. *See* Debtor's Affidavit. The check was negotiated by Cobblestone and accordingly debited from Cinagro's account which is obvious from the front and back of the check. Steven Afft at ¶ 19(8).

(9) Cinagro check to "Patch Reef Title" for $3,294 signed by the Debtor with a memo notation that is illegible and another Cinagro check to "Patch Reef Title" a year later for $1,300 marked "Contract Deposit/Escrow." Steven Afft at ¶ 19(9). Neither the Debtor nor Lovato can explain these checks, but it may have been a loan to a friend of the Debtor. Debtor 7030 at 90:5-91:13; Lovato 7030 at 80:17-81:7, Ex. 9. Nothing in Cinagro's records provides an explanation. Steven Afft at ¶ 19(9).

None of these expenses were for the benefit of Cinagro and no back-up or support for them exists anywhere in Cinagro's records. Steven Afft at ¶ 19. None of these payments were authorized by the Johnsons, or even known to them until years later. *Id*.; Susan Afft at ¶ 15.

The Debtor cannot explain these checks and transfers, only that "there must be" back-up in Cinagro's records. Debtor 7030 at 39:2-40:4 (must be "audit trail" for him taking sales proceeds from sale of Cinagro oven); 66:1-69:25 (must be an "audit trail" for writing himself a "salaries" check after he was sued and business closed when he never received any salary); 70:19-74:10 (cannot explain the cash withdrawals in (5) above, must be an "audit trail"); 97:12- 23 (no recollection of the cash withdraws of $19,000 in four checks over days, in (4) above, must be an "audit trail"). Cinagro's records set forth no support or "audit trail" of any kind. Steven Afft at ¶ 19.

Unbeknownst to the Johnsons, while the Debtor was soliciting and receiving these funds for Cinagro from the Johnsons, the Debtor was not paying Cinagro's IRS obligations for employee withholding taxes ($14,313.82) and State of Florida sales tax ($4,540.91). Steven Afft at ¶ 20. The Debtor caused Cinagro to cease paying its bills, but the Debtor was still issuing checks from the Debtor's accounts for personal expenses in (6), (7) and (8) above. Cinagro closed with a total of $432,297.62 in liabilities. *Id*. The Debtor testified that Cinagro could have paid these and its other expenses from its business revenues but for the transactions earmarked above. Debtor 2004 at 78:14-80:14.

## CONCLUSIONS OF LAW

I. **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a), made applicable to this matter by Federal Rule of

9

Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party has the burden of establishing that there is an absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets that burden, however, the burden shifts to the non-movant, who must present specific facts showing that there exists a genuine dispute of material fact. *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990) (citation omitted). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [the fact-finder] could reasonably find for that party." *Id.* (citing *Anderson*, 477 U.S. at 252). At the summary judgment stage, the Court determines only whether there is sufficient evidence upon which a reasonable fact-finder could find for the non-moving party. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).

A non-moving party cannot simply deny unrefuted record evidence, such as affidavits and testimony submitted by a moving party, in hopes of obtaining a trial; the non-moving party must come forward with significant, probative contrary evidence demonstrating the existence of a triable issue of fact to escape summary judgment. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116-17 (11th Cir. 1993).

## II. Plaintiff is Entitled to Summary Judgment as to Count I

11 U.S.C. § 523(a)(2)(A) ("§ 523(a)(2)(A)) excepts from discharge those debts incurred via "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;" 11 U.S.C. § 523(a)(2)(A). The Supreme Court has distinguished between "false pretenses and false representations" on the one hand, and "actual fraud" on the other, as two distinct paths to nondischargeability under § 523(a)(2)(A). *Husky Intern. Electronics*, 136 S. Ct. at 1586. Satisfaction of either path is sufficient. *Id.*

10

The Supreme Court held that a representation by a debtor is not required under the "actual fraud" prong of § 523(a)(2)(A). *Husky Intern. Electronics*, 136 S.Ct. at 1586. To establish that a debt is excepted from discharge based on "actual fraud," the objecting party must now prove: (1) the debtor committed actual fraud; (2) the debtor obtained money, property, services, or credit by the actual fraud; and (3) the debt arises from the actual fraud. *Id*. at 1587-88.

First, the debtor must have "committed actual fraud." 136 S.Ct. at 1587-88. There are two parts to actual fraud: actual and fraud. *Id*. at 1586. For fraud to be "actual," there must be wrongful intent. *Id*. A debtor's intent may be inferred by examining the totality of the circumstances. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir. 1994).

Fraud, as used in § 523(a)(2)(A), "connotes deception or trickery." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 11 (10th Cir. BAP 2016) (citing *Husky Intern. Electronics*, 136 S.Ct. at 1586)). In *Husky International. Electronics*, the Supreme Court declined to adopt a definition of fraud because of the multiplicity of situations in which it may be present. 136 S.Ct. at 1586-87. The Seventh Circuit Court of Appeals previously expounded:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise . . . . No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). In other words, "actual fraud is deception or trickery committed with fraudulent intent." *In re Morris*, 2018 WL 2165767, *2.

The second element is that the debtor obtained money, property, services, or credit by the actual fraud. *Husky Intern. Electronics*, 136 S.Ct. at 1587-88. "The most straightforward reading of § 523(a)(2)(A) is that it prevents discharge of 'any debt' respecting money, property, services, or . . . credit' that the debtor has fraudulently obtained . . . ." *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). "[T]he phrase 'to the extent obtained by' in § 523(a)(2)(A) . . . does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge." *Id.*

Finally, the third element requires that the debt arise from the actual fraud. *Cohen*, 523 U.S. at 218, 118 S.Ct. 1212. "Once it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." *Id.* at 218, 118

11

S.Ct. 1212; *see also Husky Intern. Electronics*, 136 S.Ct. at 1589 ("any debts 'traceable to' the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A)."). In 2016, the Supreme Court ultimately held in *Husky International Electronics*, that the term "actual fraud" used in § 523(a)(2)(A) includes and encompasses "fraudulent conveyance schemes" where a business owner drains a company of assets, leaving its creditors and others without any source of payments. 136 S.Ct. at 1586.

The undisputed facts of the instant case bear a remarkable resemblance to those in *Husky International Electronics.* With respect to the first prong of "actual fraud," over a period of four years, the Debtor made almost weekly representations to one or both of the Johnsons that Cinagro did not have enough funds to pay its bills and for operations, and for them to transfer sums for those purposes. At the same time, the Debtor was causing Cinagro to transfer hundreds of thousands of these funds to himself, or for his benefit for things unrelated to Cinagro. The Debtor has come forward with no admissible evidence to the contrary. The facts on their face constitute "deception or trickery." In *Husky International Electronics*, a debtor drained his company of assets for personal gain while the company incurred substantial trade debt, all of which was left unpaid upon its closure. In *Husky Intern. Electronics*, that alone was enough under the "actual fraud" prong. The same is even more evident on this record.

As to the second and third prongs, the Debtor obtained $759,067.14 from Steven Johnson and $360,526.00 from Susan Johnson as the result of this scheme. This is the debt to the Johnsons that arose from the Debtor's obtaining these funds for Cinagro as a result of the Debtor's deception or trickery. The Debtor does not contest these amounts.

The Debtor's Opposition at p. 5 [D.E. 51] contends, with no record support, that the Johnsons' reliance on the Debtor's representations was not justifiable because the Johnsons chose not to become actively involved in the business. However, the Johnsons were justified in their reliance on Debtor's representations due to the close nature of their relationship[2]. The record reflects that once the Johnsons investigated and stopped funding Cinagro, Cinagro closed while the Debtor sold its equipment and kept the money and continued to take money from Cinagro's

---

[2] Justifiable reliance is gauged on an individual standard, and reliance is justified where the parties have a relationship based on trust. *See: In re Vasile*, 297 B.R. 893, 904-905 (Bankr. M.D. Fla. 2003) (finding that reliance on representations made by Debtor were justified when "the hallmark of the relationship between the parties was trust).

accounts. The Debtor's argument misses the mark and does not preclude entry of summary judgment.

    A. **Amount of Non-Dischargeable Debt**

The Supreme Court has held that the amount of the non-dischargeable obligation under § 523(a)(2)(A) is the "debt that arises from the actual fraud." *Cohen*, 523 U.S. at 218, 118 S.Ct. 1212. "Once it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." *Id.* at 218, 118 S.Ct. 1212; *see also Husky Intern. Electronics*, 136 S.Ct. at 1586 ("any debts traceable to the fraudulent conveyance . . . will be nondischargeable under § 523(a)(2)(A)").

Here, it is not disputed that Steven lost $759,067.14. It is also undisputed on this record that Susan lost $360,526.00. These sums were the amount each transferred to Cinagro based on the Debtor's "actual fraud". Just as in *Husky International Electronics*, the non-dischargeable sum is not the amount removed from the company, it is the amount lost as the result of Debtor draining Cinagro's assets. In accordance with these Supreme Court cases, the amount of the non-dischargeable claims is what was lost by the creditor on account of the debtor's actions under § 523(a)(2)(A), not the debtor's personal gain from the wrongful conduct.

Courts have consistently applied this precedent as the Johnsons ask this Court to do. *See Scarborough v. Purser (In re Scarborough)*, 836 F.3d 447, 455 (5th Cir. 2016). "We . . . reject debtor's implication that a debt is non-dischargeable under section 523(a)(2)(A) only when the creditor proves that the debtor directly and personally received every dollar lost by the creditor." *In re Bain*, 436 B.R. 918, 922 (Bankr. S.D. Tex. 2010) (quoting *In re Brady*, 101 F.3d 1165, 1172 (6th Cir.1996)). A debt may be non-dischargeable under § 523(a)(2)(A) even if the debtor obtained only an indirect benefit or personally took only part of the sums obtained as a result of the fraud, i.e. some smaller portion of the amounts lost by the creditor. *See In re M.M. Winkler Assocs.*, 239 F.3d 746, 750 (5th Cir. 2001); *see also In re Smith*, 585 B.R. at 369-70 (non-dischargeable judgment in amount of investment of plaintiff, not necessarily funds debtor/defendant misappropriated).

It is not disputed that Steven lost $759,067.14 and Susan lost $360,526.00. The amount of the non-dischargeability debt and judgment in the Johnsons' favor will be in this amount

    **III.** **Plaintiff is Entitled to Summary Judgment on Count II.**

The Johnsons alternatively seek relief against the Debtor under Count II pursuant to 11 U.S.C. § 523(a)(4), which provides that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--. . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" The first of the three acts, commission of fraud or defalcation, must occur while the debtor is acting in a fiduciary capacity. *First National Bank of NW Fla. v. Thurman (In re Thurman)*, 121 B.R. 888, 889 (Bankr. N.D. Fla. 1990). Embezzlement or larceny, however, stand alone and do not require the debtor to have acted in a fiduciary capacity. At issue here is embezzlement and larceny.

**A. Plaintiffs' Have Established Embezzlement as a Matter of Law**

"Embezzlement" is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *David Landis, P.A. v. Britt (In re Britt)*, 200 B.R. 409, 410 (Bankr. M.D. Fla. 1996) (a bookkeeper forging checks results in a non-dischargeable claim) (quoting *Moore v. United States*, 160 U.S. 268 (1895)). A claim for non-dischargeability under § 523(a)(4) for embezzlement requires proof of two elements: (1) that a debtor appropriated funds for his benefit; and (2) the debtor did so with fraudulent intent or deceit. *Enterprise Maintenance and Contracting, Inc. v. Tadlock (In re Tadlock)*, 2014 WL 5080906, at *6 (M.D. Fla. Sept. 30, 2014)).

An intent to defraud is defined as an intention to deceive another person, and to induce such other person, or reliance upon such deception to assume, create, transfer, alter or terminate a right, obligation, or power with reference to property. *Id*. Concealment is often the best evidence of fraudulent intent. *Id*. at *10.

All that an embezzlement claim under § 523(a)(4) requires is a showing that funds belonged to a company and the debtor used those funds for his own personal benefit, as opposed to the company's. *ProSports Mgmt. of South, Inc. v. Jacobs (In re Jacobs)*, 243 B.R. 836, 841 (Bankr. M.D. Fla. 2000) (director taking corporate money for himself is non-dischargeable embezzlement). A managing member of the LLC who takes LLC money for personal use is classic embezzlement under § 523(a)(4). *Reiss v. McQuillan (In re McQuillan)*, 509 B.R. 773, 787 (Bankr. D. Mass. 2014). Fraudulent intent may be inferred from surrounding circumstances, and the conduct of the accused. *Cunningham v. Cunningham (In re Cunningham)*, 482 B.R. 444, 448 (Bankr. N.D. Ala. 2012)). Embezzlement with all necessary intent exists when the debtor has

14

signed the checks reflecting the embezzlement with no explanation apart from that he does not remember signing them. *See In re Vermilio*, 457 B.R. 854, 860 (Bankr. M.D.Fla. 2011)

The facts on this record reflect embezzlement as a matter of law. Over $200,000 in transfers initiated by the Debtor from Cinagro either to himself or to third parties not related to Cinagro exist on this record, along with the Debtor' testimony that he knows nothing about those transfers, or there "must be" records at Cinagro with back up. The undisputed facts are that none exists. The Debtor has had well over a year to seek admissible evidence to the contrary. The Debtor has failed to do so. It is also undisputed that the Debtor maintained exclusive control over the records that would reflect such embezzlement and successfully resisted any disclosures of them to the Johnsons. There is no issue of fact for any trial.

### B. Plaintiffs Established Larceny as a Matter of Law

Larceny is defined as the fraudulent taking and carrying away of property of another with the intent to convert such property to his own use without the consent of another. *In re Jacobs*, 243 B.R. at 842. A director's removal of a corporation's money for his own personal use is larceny. *Id*. The sums not dischargeable under a non-dischargeable larceny judgment are for the damages to the injured party, not just the benefit received by the debtor, just like those claims under § 523(a)(2)(A). *See White v. Milich (In re Milich)*, 2013 WL 4835102, *4 (Bankr. S.D. Fla. Sept. 10, 2013). As with embezzlement, fraudulent intent for larceny is reflected from surrounding circumstances and the conduct of the accused. *In re Cunningham*, 482 B.R. at 448. The facts on this record reflect larceny as a matter of law, just like with embezzlement.

### IV. Plaintiff is entitled to Summary Judgment in Count III.

Finally, Section 523(a)(6) excepts from discharge an obligation resulting from the "willful and malicious injury by the debtor to another entity or to the property of another entry." For non-dischargeability under § 523(a)(6), the injury must be both willful, meaning that the injury was intended, and malicious, meaning that the debtor was conscious of his wrongdoing. *In re Luca*, 422 B.R. 772, 775 (Bankr. M.D. Fla. 2010). Removing assets from a company for one's own use to the deprivation of other owners' or creditors' detriment constitutes willful and malicious injury. *Galaz v. Monson (In re Monson)*, 522 B.R. 721, 730-31 (Bankr. M.D. Fla. 2015), *aff'd*, 661 Fed. Appx. 675 (11th Cir. Nov. 21, 2016). As long as the debtor has knowledge of what he is doing and the harm it will cause the creditor, even if financial only, that itself is willful and malicious injury. *Id.*; *see also: In re Jennings*, 670 F.3d 1329, 1333-34 (11th Cir. 2012)

15

(knowingly taking action that impairs another's ability to collect on a loan, even unsecured, violates § 523(a)(6) and creates a non-dischargeable obligation). The Debtor cannot dispute that he knew he was taking the Johnsons' money from Cinagro and that as a result, that money was lost to the Johnsons.

## **CONCLUSION**

The Court has determined Plaintiffs' are entitled to judgment as a matter of law as to Count I, Count II and Count III. Accordingly, Plaintiffs' Motion will be granted, the Court will enter a non-dischargeable judgment against the Debtor pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6) in the amount of $360,526.00 in favor of Susan Johnson and $759,067.14 in favor of Steven Johnson. The Court will enter judgment by separate order.

###

*The Clerk shall furnish copies to*
Plaintiffs
Defendant